LANGDON *et al. v.* BRANCH *et al.*

*(Circuit Court, S. D. Georgia, E. D.* November 20, 1888.)

1. CORPORATIONS—TRAFFICKING IN STOCK OF COMPETING CORPORATION — RAILROAD COMPANIES.

An insolvent construction company contracted to build a railway for a corporation, and received nearly all of the latter's stocks, bonds, and assets as security for its outlay. Without beginning the work, the persons in control of the construction company transferred all the stock to the persons managing another railway already in operation, among whom were the president and many of its directors. The funds of the latter corporation were used in purchasing the stock of the construction company, and in this manner the said stock, and the stock and assets of the projected road, were controlled by the same management as the road then in operation. The latter began at the same point, and ran for nearly the same distance, and in the same general direction, as the projected line, which would be, when completed, a competing line. *Held,* that the evident purpose and effect of the transaction was to violate by indirection Const. Ga. art, 4, § 2. par. 4, rendering the purchase of the stock of one corporation by another, and any contract between them tending to lessen competition in their respective businesses or to encourage monopoly, illegal and void.

2. SAME—INJUNCTION—RIGHTS OF PLEDGEES.

Equity will enjoin the carrying out of such an agreement, and will seize the assets of the insolvent construction company at the instance of persons who have loaned money to its president and sole manager to use in building the road, on the faith of his pledge of a share of the profits derived from the work; the company occupying as to them the relationship of derelict trustees.

3. EQUITY—PLEADING—MULTIFARIOUSNESS.

Three creditors, each of whom severally loaned money to the president for the purpose mentioned, under pledges of portions of the profits, may join in a bill for such relief.

In Equity. Bill for injunction.

The complainants, Richard Langdon, J. C. McNaughton, and L. A. Conwell, citizens of the state of Pennsylvania, bring their bill against the Savannah, Dublin & Western Short-Line Railway, a corporation of this district; the United States Construction & Improvement Company of New Jersey, doing business in the city of Savannah; James A. Simmons, of the state of New York; Thomas P. Branch, a citizen of this district; and the Central Railroad & Banking Company of Georgia,—and allege that the Savannah, Dublin & Western Short-Line Railway Company is incorporated to build and operate a railway from Savannah to Dublin and Americus; that the Macon & Dublin Railway Company is incorporated to build a railroad from Macon to Dublin; that the former bought all the charter rights and franchises of the latter, and in that manner became authorized to build and equip a railroad from Savannah to Macon; that on the 18th of March the Savannah, Dublin & Western Short-Line Railway Company (which, for conciseness, we will term the Short-Line Company) and John McKetchney made a contract by which the company deposited with McKetchney all its capital stock except $60,000, its mortgage bonds to the amount of $3,000,000, with its local aid and all the bonds to be issued on that part of the road between Dublin and Macon,—the entire property to be delivered, to be held by McKetchney as security for all of his outlay on the road, with full power to sell or pledge the same to

v.37 F.no.10—29

secure funds for its construction. McKetchney, in consideration of this agreement, obliged himself to build, construct, and equip the road from and to the terminal points above mentioned, subject to any changes that might be agreed on by the parties. On the 19th of March, McKetchney assigned by written instrument his rights under this contract to the United States Construction Company, chartered in New Jersey, to construct, build, lease, or purchase railroads. This was done with the assent of the Short-Line Company; and the bill alleges with distinctness that this created a trust in the Construction Company to build the road from Savannah to Macon. On the 19th of March, 1887, the Construction Company and the Short-Line Company made a supplemental contract, whereby the former undertook to pay certain existing liabilities of the latter in the amount of $19,228.92 for the pay of civil engineers' work, services, and material, as indicated in a schedule attached to such contract; the payment to be deemed a part of the cost of construction. The Construction Company agreed further to pay to the Short-Line Company $28,-940.95 for the charter and franchises of the Macon & Dublin, to enable the Short-Line Company to perfect its title to the Macon & Dublin Company. Copies of the several agreements before referred to are attached as exhibits to the bill, and are not questioned. On the 22d of March, 1887, an agreement was entered into between Thomas P. Branch, of Augusta, and James A. Simmons, of New York, reciting the facts that they had obtained the organization of the Construction Company in New Jersey, with a capital stock of 1,000 shares, of the par value of $100 each, and that 946 shares had been issued as full-paid stock to John McKetchney, and, together with $2,700, delivered to him as the consideration for the assignment to the Construction Company, of the contract of March 16, 1887, between the Short-Line Company and McKetchney; and that the Construction Company had undertaken to pay certain debts of the Short-Line Company, amounting to about $19,292, which John McKetchney had not assumed; and that by "assignment" and "transfer duly made" the 946 shares of Construction Company stock owned by McKetchney was now the property of Branch and Simmons, share and share alike; Branch and Simmons undertaking to advance equal portions of the amount necessary to pay the claims before mentioned against the Short-Line Company. They agreed further to hold for three years from March 22, 1887, 510 of the 946 shares of the Construction Company stock, unless otherwise mutually agreed, and that one certificate for the 510 shares should be issued to James A. Simmons and Thomas P. Branch, jointly; that it could be transferred by consent of both; that its voting power should be exercised jointly. It was agreed that the remaining 436 shares should be issued in like manner to Thomas P. Branch and Cornelius V. Sidell, jointly, with like provision as to transfer. This agreement was made binding on their legal representatives and assignees. The parties were to be entitled to an interest in the said shares proportionate to the amount each paid only, to the sum necessary to pay the debt of the Short-Line Company. Sidell and Branch received the 436 shares, and agreed to hold them upon the terms agreed to by Simmons and Branch on the 23d

of March, 1887. A copy of the agreement is attached. Simmons thereafter obtained Branch's and Sidell's interest in the entire matter. He became in this manner fully possessed of the assets of the Short-Line Company and the trusts of the Construction Company. On the 20th of April, 1887, Simmons agreed with Richard Langdon, one of the plaintiffs, that if he (Langdon) would discount Simmons' promissory note for $5,000, payable four months after date, for the purpose of raising the sum which Simmons had undertaken to pay by his contract with Branch, he (Simmons) would pay to Langdon one-fourth of all the gains, profits, and emoluments which should accrue to Simmons by virtue of the contract before described. In case it became necessary to pay the note, Langdon and Simmons each agreed to pay an equal proportion. Langdon avers that he performed his part of the agreement, but that Simmons failed to perform his. The bill further alleges that on the 21st day of April an agreement was made by Simmons and J. C. McNaughton, one of the complainants, who gave his note the 21st of April, 1887, to the said James A. Simmons, payable four months after date, for the sum of $5,000. Subsequently, in lieu of this note, he gave Simmons his check for $2,000, and a new note for $3,000. McNaughton did all he had promised, but Simmons wholly failed to keep covenant. On the 27th of December, 1887, the defendant Simmons and the plaintiff L. A. Conwell agreed that, in consideration of the payment to Simmons by Conwell of $2,300, Simmons, his heirs, assignees, etc., agreed to pay Conwell one-sixth of the profits and emoluments of the contracts before described. In case the advances were repaid by the Construction Company, Simmons agreed to pay Conwell $791.66. Conwell paid the $2,300. In this manner the required sum was raised. Copies of all the contracts referred to are annexed and made exhibits to the bill. The complainants aver that under these several agreements they became equitably interested in all of the contracts for the construction, building, and equipment of the railway, and further that they became equitably entitled to the extent of their interest to the security of the stocks, bonds, and other assets of the Short-Line road which had been originally transferred to McKetchney for the purposes of the trust created in him, viz., to build the Short-Line road, and subsequently vested in James A. Simmons for the United States Construction & Improvement Company.

The complainants charge that Branch and Simmons, who themselves, without consulting the stockholders or other officers, managed the affairs of the Construction Company, have unlawfully, secretly, and privily conspired and confederated with unknown parties to cheat and defraud the complainants; and, without the knowledge or authority of plaintiffs, or the directors and stockholders in the Construction Company, they have sold to Thomas P. Branch, for a nominal consideration, all of their interests in the stock of the Construction Company; and that Branch and Simmons have entered into an agreement to sell and deliver the entire control of the Construction Company, with all the securities, stock, and bonds of the Short-Line Company, delivered to them to build, construct, and equip the road, to the Central Railroad & Banking Company of

Georgia, for the purpose of defeating the construction of the road, and to render it impossible for the Construction Company to do so, and thus to cheat and defraud plaintiffs of all returns to which they were legally entitled by their contract. The plaintiffs charge upon information and belief that Simmons and Branch have made a large profit for themselves out of the action, and that their action was void, and in excess of their power; that Branch and Simmons have not disclosed their designs, but lulled plaintiffs into a false sense of security; that plaintiffs will now be totally defeated of their rights and interests, which are of great value. Complainants distinctly charge that the attempted purchase by the Central Railroad & Banking Company of the control of the stocks, assets, and properties of the United States Construction Company is a contract or agreement which has the effect, or was intended to have the effect, to defeat or lessen competition in their respective business, and to encourage a monopoly, contrary to the express provision of paragraph 4, § 2, Const. Ga., and that the same is therefore illegal and void, and should be so decreed by the court. They allege that the amount or value in dispute exceeds the sum of $2,000, and that all the assets and property to which they have an equitable lien are in the district, and in the jurisdiction of the court.

An amendment to the bill makes a party E. P. Alexander, a citizen of Georgia, residing in this district, and within the jurisdiction of the court, and the Savannah & Fort Valley Railway Company, a corporation also within the jurisdiction. The amendment further charges that the whole scheme of Branch and Simmons was a fraudulent speculation; that they had no intention to comply with the contract of the Construction Company to build and equip the Short-Line road; that the Construction Company was in truth nothing but a fiction, and was used to protect Branch and Simmons from any individual liability; that they had absolute control of the Construction Company; and that its capital stock was never actually paid in by them, but that Branch and Simmons adopted the favorite plan and device of corporate manipulators to realize large gains and accumulate fortunes at the expense of the public, and used that as stock which was a mere fiction. They charge further that the United States Construction Company is insolvent, and had admitted the rights of complainants. This was made evident by placing the plaintiff Langdon on the board of directors of that company; and Branch also admitted the rights of the complainants as they are set out in the bill; that the Savannah, Dublin & Western Short-Line Railroad Company also had knowledge of plaintiffs' advancements to its construction fund, and their resulting rights, and placed Langdon on the board of directors of that company also, in order that he might protect the rights of himself and of his associates; that E. P. Alexander, made party by the amendment, is president of the Central Railroad & Banking Company, and in contracting for the purchase and transfer of the stock of the Construction Company acted in the interest of the Central Railroad & Banking Company; that the Savannah & Fort Valley Railway Company is a corporation recently formed of the friends of the Central Rail-

road & Banking Company; that E. P. Alexander is likewise its president; that it is a creature of that company; that the purchase of the stock of the stockholders of the Short-Line Company was made by H. C. Cunningham, and A. R. Lawton, Jr., of the firm of Lawton & Cunningham, the general counsel of the Central Railroad & Banking Company, and *ex officio* of the Savannah & Fort Valley Railroad and the Short-Line Company, and the United States Construction & Improvement Co.; and that the money paid was the money of the Central Railroad & Banking Company. The bill further charges that the Fort Valley Company, and the parties in whose name the stocks purchased as aforesaid stand, are not holders for value, but in truth hold them for the Central Railroad & Banking Company of Georgia; and that the assumption by the Savannah & Fort Valley Railroad Company of the Construction Company stock bought by E. P. Alexander is itself a contract or agreement which has the effect to defeat or lessen competition, and to encourage a monopoly, contrary to the express provision of paragraph 4, § 2, Const. Ga., and should be so decreed by the court. There is a general prayer for discovery, and many interrogatories addressed to E. P. Alexander and the Savannah & Fort Valley Railroad Company, by which they seek disclosure of the transaction hereinbefore described, and the present relations of the parties, and their purposes and dispositions with reference to the complainants' alleged interest and the stock assets generally of the Short-Line Company, upon which complainants seek to assert and enforce an equitable lien.

The prayers of the original bill are (1) that the attempted purchase of the contracts, stock, securities, and assets of the United States Construction & Improvement Company be declared void and of no effect, and that the Central Railroad & Banking Company of Georgia be declared a trustee for the benefit of complainants of all the stocks, contracts, assets, and other properties belonging to the Construction Company, in its possession or under its control, to the extent of orators' interests; (2) that Simmons and Branch may be compelled to account generally for all money or properties received by them from the Central Railroad & Banking Company or its representatives or other parties, and that an account may be immediately taken, and that they may be declared trustees for the benefit of plaintiffs; (3) a general and special prayer for discovery, with many interrogatories to Branch and to Simmons, and others, and to the Central Railroad & Banking Company. They pray for a temporary injunction until the hearing to restrain Branch and Simmons, the Construction Company, the Short-Line Company, and the Central Railroad & Banking Company, and other parties defendant, from consummating or carrying into effect any contracts, engagement, or agreement by which complainants may be defrauded of their rights, and for general relief, subpœna, etc.

In the amended bill the plaintiffs pray that E. P. Alexander, the Fort Valley Railway, and Construction Company may be compelled to make full and complete discovery under oath of all contracts, dealings between themselves and Branch, Simmons, the Construction Company, and the

Short-Line Company, in relation to transfer of all the stocks, bonds, assets, and other properties of the Short-Line Railway Company, which were pledged with the Construction Company as security for their contract to build the road from Savannah to Macon, which may be in the possession and under the control of either of the defendants; and of all copies of the correspondence; and that they attach to their answer true and correct copies of all agreements, etc. They pray also that all the defendants may be enjoined from moving out of the jurisdiction of this court any of the contracts, stocks, bonds, securities, or other property in which the complainants are alleged to be interested; and, further, that the United States Construction & Improvement Company be enjoined from transferring to any one the stocks, contracts, etc., received by it from the Short-Line Railway Company under the contract described, and for general relief. There is a prayer for subpoena against E. P. Alexander and against the Savannah & Fort Valley Railway Company in the usual form. The bill and the amendment are properly verified.

E. P. Alexander, the Central Railroad & Banking Company of Georgia, the United States Construction & Improvement Company, the Savannah, Dublin & Western Short-Line Railway Company, all demurred to the bill generally, upon the ground that there is no equity in the bill; that the bill is multifarious both as to the subject-matter and to the parties; that the complainants have no title such as would justify their prayers for discovery. The demurrers were overruled, and held not sufficient to defeat the application for injunction.

Thomas P. Branch has filed a formal answer, denying that legal service has been effected upon him. The other defendants have also answered. E. P. Alexander and the Central Railway & Banking Company of Georgia, somewhat in detail, and the Short-Line Railway Company, the Construction Company, and the Savannah & Fort Valley Railway Company, adopt the answers of E. P. Alexander and the Central Railroad & Banking Company for the purpose of this motion. The answers may therefore be treated as identical. They cannot be held sufficiently responsive as answers upon the final hearing, and are apparently intended to be used simply in reply to the rule to show cause, and are so entered. E. P. Alexander, in his answer, admits that he purchased from Thomas P. Branch all of the stock of the United States Construction Company in good faith, and paid Branch the sum of $100,000 therefor; that by the purchase he became entitled to all the stock, and the same was by his direction transferred and put in the names of the parties now holding the same; that he was not aware of the rights of the plaintiffs, as evinced by their contracts appended to the bill; that Branch exhibited to him two certificates of stocks in the Construction Company,—one for 510 shares, and one for 436 shares; that both of said certificates were signed by Douglas Green, president, and M. J. Verdery, treasurer, who are known to him as the president and treasurer of the Construction Company. A copy of the certificate is incorporated in the answer. That in addition to these 946 shares he bought the stock of the following parties: M. J. Verdery, 20 shares; Thomas P. Branch, 15 shares; A. F. McLeish, of New York city,

15 shares; Thomas A. Simons, 2 shares; Edward W. Scott, of New York city, 1 share; Douglas Green, of New York, 1 share. He answers that he does not believe that the United States Construction & Improvement Company was organized for fraudulent speculation, and if it was he does not know it; that it is not more insolvent now than it was at the time the plaintiffs made their contracts with it, and that it has the same assets now that it had at the time of the sale to him, except 1,500 shares of the capital stock of the Savannah, Dublin & Western Short-Line Railway Company, which have since been transferred by the Construction Company for a valuable consideration. As complainants are only interested in the profits that might accrue to Simmons under the contracts of the Construction Company and the Short-Line Railway Company, if the Construction Company is insolvent there could be no profits accruing out of the contracts, and the company will not be bound to respond to the plaintiffs in any amount. He denies that the Construction Company ever admitted the rights of plaintiffs, and insists that if the plaintiffs have lost it is from their own laches. He denies that Richard Langdon was ever a director in the Construction Company, and gives as a reason that Langdon never owned any stock in said company. He denies that the Savannah, Dublin & Western Short-Line Railway Company, since the assignment of McKetchney, could admit the existence of a lien against the Construction Company, or could bind them or any other person. He answers further that, in acting in the purchase of the stock of the Construction Company, he did not act for the Central Railroad & Banking Company, but acted in behalf of and for the interest of the Savannah & Fort Valley Railway Company, which company was duly chartered to build and operate a railway from Savannah to Fort Valley, and the stock of the Savannah, Dublin & Western Short-Line Railway Company was not purchased for the Central Railroad & Banking Company, but was purchased *bona fide* for the Fort Valley & Savannah Railway Company, which company was chartered to build a road from Savannah to Fort Valley, which was the general direction in which the Savannah, Dublin & Western Short-Line Railway was projected; that the stock so purchased by the Fort Valley and the Savannah Railway Company was that in which the Construction Company had no interest, and was that portion of the stock of the Short-Line Company which was in the names of its original projectors, and which had never been transferred or assigned to any one else; that plaintiffs never had any interest, equitable or legal, or any lien on said stock. This answer is verified by the oath of E. P. Alexander.

The answer of the Central Railroad & Banking Company of Georgia is verified by E. P. Alexander, also, as the president of that company. This answer denies that the Short-Line Railway Company purchased from the Macon & Dublin Company its franchises, or any part of them, and that the Short-Line Company has no authority under its original charter, or under any purchases, to build a railroad from Savannah to Macon; that the contract referred to and set out in the resolution of the Macon & Dublin Railroad Company was never carried out, and it could not now

be carried out, however desirable such contract might be. It admits that the contract in Exhibit A to the bill was entered into between John McKetchney and the Short-Line Railway Company; that said contract was assigned to the Construction Company under the terms set forth in Exhibit B to the bill; that the contract set out in Exhibit C to the bill was also made. As to the contract set out in Exhibit D, as made between Thomas P. Branch and James A. Simmons, it denies any knowlege save that derived from the plaintiffs' bill. The answer admits that it was aware that 946 shares of the stock of the Construction Company had been issued in two certificates,—one for 510 shares in the name of James A. Simmons and Thomas P. Branch, jointly; and the other 436 shares in the names of Thomas P. Branch and Cornelius P. Sidell, of Georgia. These certificates are now in the hands of the Construction Company, and the assignment on the back of the two certificates is signed by the parties in whose names they were issued, and they have been delivered to the company for cancellation and the issue of new scrip therefor in names of other parties, and this has been done by the Construction Company. It denies any knowledge of the contracts between Simmons and Langdon, and Simmons and McNaughton, and Simmons and Conwell, and it denies that either of the plaintiffs under the three agreements, E, F, G, annexed to the bill, are equitably interested in any of the contracts for the construction, building, and equipment of the Short-Line Railway; and it denies that the plaintiffs have any interest, legal or equitable, in the stocks, bonds, or other securities which were turned over to John McKetchney under the first contract set out in Exhibit A. It avers that Thomas P. Branch is neither a director in the Construction Company nor in the Short-Line Company. James A. Simmons is the nominal president of the Construction Company, but before the filing of the bill of complainants he had sold his interest therein, and his place in the board of directors would have been filled at the next meeting of the board. It is unaware of a conspiracy between Branch and Simmons to defraud Langdon, McNaughton, and Conwell, or either of them; and it further says that no part or portion of the stock, bonds, and other securities of the Short-Line Railway was ever deposited with any one for securing the contracts referred to by complainants in their bill. This is stated on the knowledge, information, or belief of the defendant. The answer states further that it is not advised what consideration Thomas P. Branch paid for the stock of the Construction Company, but denies that Branch ever purchased an interest in the contracts to build the Savannah, Dublin & Western Short-Line Railway; that all the interest in these contracts was vested in the Construction Company under the assignment made by John McKetchney, and the said contracts have remained in the possession of the Construction Company ever since that assignment, and are now in its possession, and owned exclusively by it. It denies that Branch and Simmons, or either of them, has entered into any agreement to sell and deliver the control of the Construction Company or any of its contracts to the Central Railroad & Banking Company; and it alleges that all the stock of the Construction Company has already been sold and transferred to, and is

now held by, the stockholders in said company; and that said Branch has no interest whatever in said company, nor said Simmons any other interest than that heretofore set out. The defendant admits, however, that while the stock of the Construction Company is not held by the defendant, it is held by persons who are interested in defendant. It does not know of any purpose or intent on the part of any person to cheat or defraud either of the complainants; and if such fraud was accomplished, and if the stock of the Construction Company, was intended to be held for the security of the plaintiffs, for their advancements to Simmons, the laches of the plaintiffs made it possible for Branch and Simmons to dispose of said stocks. It denies further that the contracts, securities, stocks, and bonds of the Short-Line Company have been sold or transferred to this defendant, the Central Railroad & Banking Company, and insists .that all of said contracts and securities are now held by the Construction Company, as they were at the time of the sale by Branch and Simmons, with the exception of 1,500 shares of the capital stock of the Short-Line Railway Company, which have been transferred to sundry parties for money advanced to said Construction Company to carry out the purposes of its organization. It does not know what profits Branch and Simmons made. It was not advised of any limitation on the power of Branch and Simmons to transfer and assign their interest in the Construction Company. If such limitation existed, and was known to the plaintiffs, they are in laches, which rendered it possible for Branch and Simmons to transfer and sell out their interest, and plaintiffs are not therefore entitled to any relief as prayed for in the bill. The answer denies that the plaintiffs have any title or interest which will justify their prayer for relief, and it denies that it has made any attempt to purchase the control of the contracts, assets, and property of the United States Construction & Improvement Company. It denies that it has the control of the Savannah, Dublin & Western Short-Line Railway Company; and that it is under the control of its own board of directors, duly elected at its last annual meeting, which board is engaged in discharging its duties devolving on them as such directors, and is endeavoring to bring order out of chaos, that has developed in the management of said company.

The answers to the interrogatories are substantially the same as the denials in the bill. The gist of the answers are as follows: That it is not true that Simmons and Branch have transferred to the Central Railroad & Banking Company of Georgia, or to persons suggested by it, the interests of the Construction Company in the Short-Line Company. The Central Railroad & Banking Company has not bought, paid, or promised to pay Branch and Simmons or anybody for such interest, but the contract was entered into by E. P. Alexander individually on the one part and Thomas P. Branch on the other part, whereby the said Alexander covenanted and agreed to pay to the said T. P. Branch $100,000, on delivery to him of all the capital stock of the United States Construction & Improvement Company, which was duly carried out by the said T. P. Branch; and the said sum of $100,000 was duly paid by the Sa-

vannah & Fort Valley Railway Company, of which the said E. P. Alexander was and is a director, said company having assumed the said contract. It is not true that the Central Railroad & Banking Company of Georgia has bought out the interest of the stockholders and incorporators of the Savannah, Dublin & Western Railway Company residing in Georgia. In the anwer to the fifth interrogatory the defendant said the stockholders of the United States Construction & Improvement Company are as follows: T. G. Hillborn, 946 shares; E. P. Allen, 47 shares; C. R. Woods, 2 shares; H. B. Hollins, 2 shares; H. C. Cunningham, 1 share; and two shares standing in the name of James A. Simmons, which have been assigned by Simmons. The stock-book of the Savannah, Dublin & Western Railway Company shows that there are now standing 29,775 shares in the names of the following parties: United States Construction & Improvement Company, 27,900; H. Blunn, 115; C. R. Woods, 135; S. A. Woods, 50; H. C. Cunningham, 150; A. R. Lawton, Jr., 149; J. K. Garrett, 50; E. P. Alexander, 49; A. Vetsburg, 50; D. M. Hughes, 1; J. L. Warren, 1; Douglas Green, 25; J. J. Wilder, 98; E. M. Green, 102; F. G. Du Bignon, 201; W. W. Frazer, 197; Wallace Cummings, 204; Charles H. Dorsett, 100; George J. Baldwin, 175. The answer closes with a general denial of the plaintiff's complaint, and prays that the defendant be discharged, with its reasonable costs.

*Charlton & Mackall*, for complainants.

*Lawton & Cunningham* and *George A Mercer*, for defendants.

SPEER, J., (*after stating the facts as above.*) The foregoing is a statement of the issues involved in the motion under consideration. Upon the hearing first had, a temporary injunction was granted, as prayed for in the bill, until more complete argument could be made. Pending this argument, the hearing was adjourned from chambers at Savannah to chambers at Macon. The solicitors for the complainants and the defendants, except for James A. Simmons and Thomas P. Branch, were fully heard. No one appeared for these parties. After the argument had concluded, the papers were taken *sub judice*, and the decision has just been reached. Stripped of the amplification and verbiage of the bill, answers, and affidavits, the facts may be condensed as follows: The Savannah, Dublin & Western Short-Line was chartered to construct a railway from the city of Savannah to Dublin; and for the purpose of extending the road to Macon that company secured or attempted to secure the franchises of the Macon & Dublin Railroad Company, which would enable it to complete the line. It is unnecessary, for the purpose of this motion, to determine whether or not the Short-Line actually secured the rights of the Macon & Dublin Company. It is undeniable and indeed admitted that the Short-Line made a valid contract with John Mc-Ketchney to build, equip, and construct its road as far as its charter rights and purchased rights permitted. The language of this contract is highly essential to the comprehension of the trust, which the plaintiffs insist has been betrayed to their injury, and in violation of the organic law of the state. It is as follows:

"This agreement, made and entered into this 18th day of March, A. D. 1887, by and between the Savannah, Dublin & Western Short-Line Railway Company, party of the first part, and John McKetchney, party of the second part, witnesseth: Whereas, the said party of the first part is duly incorporated under the laws of the state of Georgia to build, construct, equip, and operate a railway from Savannah, Georgia, to Dublin and Americus, in the same state; and whereas, the Macon & Dublin Railroad Company, a corporation also incorporated under the laws of the state of Georgia to build, construct, equip, and operate a railroad from Macon to Dublin, in the state of Georgia; and whereas, the first-named company have purchased from the Macon & Dublin Railroad Company all of their rights, franchises, and privileges, together with all work done and materials furnished on said railway, as by reference to a resolution of the board of directors of the Macon & Dublin Railroad Company, hereto attached, will more fully appear; and whereas, the said party of the first part is now desirous of building and completing the said railway from the city of Savannah to Macon by way of Dublin, and from Dublin to Americus; and whereas, the said party of the first part has already executed a mortgage on its said road, and has issued its mortgage bonds to the amount of three million (3,000,000) of dollars, and has issued its capital stock to the amount of 3,000,000 of dollars, and has secured local aid along the line of the said roads by subscription to the capital stock at par to the amt. of about $278,000, and does agree that so soon as it shall be legal to do so it will properly execute and record a mortgage on that portion of its line between Dublin and Macon, and will simultaneously issue its mortgage bonds and capital stock on the same at the rate of fifteen thousand (15,000) dollars per mile respectively: Now, therefore, for and in consideration of the sum of one dollar, each to the other in hand paid, the receipt whereof is hereby acknowledged, and other good and valuable considerations, it is agreed and understood as follows: *First.* The party of the first part shall forthwith deposit with the party of the second part all of the before-mentioned capital stock except sixty thousand (60,000) dollars, taken by the corporators' mortgage bonds and local aid, which have already been issued and secured; and will further deposit with the party of the second part, immediately on the issuing of the same, all of the before-mentioned stock and bonds applicable to that portion of the road between Dublin and Macon; also any and all local aid it may hereafter secure; all of which said stock, bonds, and local aid shall be held by the party of the second as security for any and all advances made, expenses incurred, money invested, work done, and materials furnished on said road, with full power to the party of the second part to use by sale or otherwise the said stock, bonds, and local aid for the purpose of securing the funds to carry on the construction of said road substantially as hereinafter set forth. *Second.* In consideration of the before-mentioned covenants and agreements, to be kept and performed by the party of the first part, and the before-mentioned stocks, bonds, and local aid to the extent of $3,700,000 of said bonds and $3,940,000 of said stock, and all local aid procured or hereafter to be procured by said company, the said party of the second part agree to build, construct, and equip the said railroad from and to the terminal points above mentioned, subject to any changes that may hereafter be agreed upon by the parties hereto; such road to be of single track standard gauge, with steel rails of fifty-six pounds to the yard, to be well laid with the usual ballast in that locality, to have the necessary sidings, turn-outs, depots, water-tanks, and turn-tables, with 2,640 ties to the mile, which shall be of good, sound yellow-pine, of not less than eight-inch face, six inches thick, and eight and one-half feet long. The road-bed on embankments shall be fourteen feet wide on the top, with slopes of one and one-half feet horizontal to one foot perpendicular; with cuts eighteen feet wide at bottom, with one foot horizontal to one foot perpendicular, except when in rock, when it shall

be one-quarter foot horizontal to one foot perpendicular. The cuts shall be properly drained with ditches three feet wide, on either side, leaving a twelve-foot road-bed at sub-grade. The bridges shall be what are known as the 'Howe Truss or Combination.' The trestles and water-ways shall be ample, and constructed of first-class material. The grades shall not exceed seventy-five feet to the mile, and the curves shall not exceed six degrees. The work on the entire line shall be done in a first-class, workman-like manner, and, when complete, compare favorably with new roads of a like character that are now being constructed in the state of Georgia. The terminal and depot facilities shall be ample for the requirements of said road. The rolling-stock shall be first-class, and of sufficient quantity to fully meet the requirements of the operation of the said road; the details of same to be hereafter agreed upon. The said road shall be completed from Savannah to Macon in twelve months from date, and from Dublin to Americus within six months from the time of the completion from Savannah to Macon. The said party of the first part may appoint a consulting engineer of the said party of the second part as to allignments, grades, curvatures, and general character of work to be done. The said party of the first part, through its president, A. B. Ninderman, shall at all times be at the service of the said party of the second part for the purposes of securing local aid and the necessary rights of way and terminal facilities required. It is understood and agreed that all the covenants herein contained shall be binding on the heirs, executors, administrators, and assigns of the respective parties hereto. In testimony whereof the said parties hereto have set their hands and seals the day and year first above written."

Thus, to enable McKetchney to raise the necessary funds to construct the road, it transferred its entire assets to him. McKetchney undertook the contract, but subsequently, with the assent of the Short-Line, transferred his contract to the United States Construction & Improvement Company, a corporation chartered under the laws of New Jersey. Whatever McKetchney was bound to do, the Construction Company was bound to do also; and most undoubtedly, therefore, the Construction Company was bound to build, construct, and equip the road of the Short-Line, as marked out in the contract. It has no other power. After long and patient consideration, the court has not been enabled to discover any power in the assignees of this contract to change the nature or purpose of their undertaking. The original power and vitality of their contract sprang from the act of the general assembly of Georgia. This created a legal entity for one purpose only, and that to build, construct, and equip the railway. The contract with John McKetchney simply transferred the duty to execute this power to him. His conveyance to the Construction Company, of which Branch & Simmons obtained the control, did not and could not alter a jot or tittle the legal duty, its nature, extent, scope, or method of performance. In creating a charter to build the railway the legislature *ex vi termini* excludes the power in any person or corporation to suppress or defeat its construction. This is equally true of the contracts in evidence. Of course this result can be accomplished by the non-action of the holders of stock lawfully issued or lawfully obtained, and we presently reach this feature of the rights in issue.

James A. Simmons, the president of the Construction Company, which had now assumed by the transfer the duties devolving under the law upon the Short-Line Company, assuming for the present that his purposes were

honest, and in good faith, found it necessary, before he could obtain control of the contracts which were vested in McKetchney, to raise $19,228.92, to pay off immediate demands against the road. To do this he applied to the plaintiffs Langdon, McNaughton, and Conwell. These parties, in consideration of the promise on his part for the Construction Company to pay to them a portion of the profits of the contract which had been made with the Short-Line, and now to be performed by him as its president, advanced the money in different amounts, and under the terms as set out in the contract annexed to this bill. It cannot be doubted that the Construction Company had the right to borrow this money, necessarily to be used in its undertaking; and it does not seem capable of fair doubt that the Construction Company would have the same right to pledge to its creditors a share of its profits as consideration and security for the loan. It was stipulated that it should be held or deemed a part of the construction fund. The plaintiffs, then, have a distinct equitable interest in the work which the Construction Company had undertaken. They look to its performance for their compensation, and they do so with clear equitable right. That company has assumed the twofold trust. It has undertaken, by transfer, the trust which John McKetchney assumed from the Short-Line, namely, to construct and equip its road. It has assumed, in consideration of the advances made to enable it to carry out that trust, to pay a share of its profits to those who made the advancements. Having obtained full control in this manner of the assets of the Short-Line, it is clear that, had the Construction Company gone forward and performed its trust with good faith, and in accordance with its terms, the plaintiffs would be entitled to have an accounting for any profits which were resulting from the building and equipment contracts. It could not be insisted with any degree of fairness that the Construction Company, after obtaining the money of outside parties, to be used for its purpose, could refuse to account in any manner. Nor would a court of equity tolerate the suggestion that under such obligations the Construction Company, or those who control it, could refuse to do anything, and yet retain the advancements which had been made. If it were capable of proof that the Construction Company, or those persons who were in its control, utterly refused to carry on the enterprise in which its creditors (the plaintiffs) now have an interest, the court, in that manner being debarred of any power of saying whether or not there were profits resulting, would, under the power for general relief, be authorized to grant a decree against the parties culpable for the full sum of which the creditors had been wronged, and such damage as could be clearly made to appear. It would have the further power to seize, if within its jurisdiction, the valuable assets of that company, and subject them to the payment of these advances. In the presence of such a trust, of such faithless trustees, and such fraud as is alleged and scarcely disputed, it would be in the domain of an ancient and clearly-defined province of equity jurisdiction, that the relief to the plaintiffs could be found; and this is the more clear where the trustee—the Construction Company—is insolvent.

This being true, how do the facts of the case present themselves to the chancellor? That the Construction Company had assets of the Short-Line Company for a valuable amount (how much, does not as yet plainly appear, but certainly worth, if we may judge from the price that was paid for them, $100,000) is most apparent. And to these assets the equitable lien of the creditors will attach, if they are in the hands of the Construction Company, or elsewhere within the reach of the court. Where are they? According to the theory of the answers of Gen. Alexander and the Central Railroad & Banking Company they now belong to new stockholders of the same company. These stockholders are admitted to be the friends of the Central Railroad & Banking Company; they are in fact its president and several of its directors. It is not denied that the transfer of the assets was obtained by money which was the money of the Central Railroad & Banking Company. It is true that Gen. Alexander states in his answer that it was an individual transaction, but it is specifically charged in the bill, and specific interrogatories are put to him which would enable him to deny it if not true, that the money which bought the assets of the Construction Company was the money of the Central Railroad & Banking Company. Indeed, this was admitted in the argument.

Another step in the argument. It is charged in the bill, and not denied in the answers, and besides it is perfectly evident to every intelligent mind, that the Short-Line Railway Company runs parallel, in large measure, with the line of the Central Railroad & Banking Company, extending from Savannah toward Macon, which are important business and terminal points, and that this railroad, if completed, would be a competitive, and dangerously competitive, railway; and there can be no doubt, whatever may be the forms and ceremonies as to the purchase from the Construction Company of the control of the Short-Line Railway, that it was either to defeat its completion, or, when completed, to prevent by harmonious control its effective competition with the Central Railroad & Banking Company of Georgia, of which the present stockholders of the Construction Company are the president and many of the directors. The fundamental law of Georgia, upon this subject is plain and emphatic, and was intended to defeat the precise transaction which, by the averments of the bill, the indisputable facts, and the admissions of the defendants, is so clearly made to appear to the court. Paragraph 4, § 2, art. 4, Const. Ga., is as follows:

"The general assembly of this state shall have no power to authorize any corporation to buy shares or stock in any other corporation in this state, or elsewhere, or to make any contract or agreement whatever with any such corporation, which may have the effect, or be intended to have the effect, to defeat or lessen competition in their respective businesses, or to encourage monopoly; and all such contracts or agreements shall be illegal and void." Code, § 5097.

This is the action of the sovereign people of Georgia in convention assembled. They chartered the Central Railroad & Banking Company. They chartered the Savannah, Dublin & Western Short-Line Railway

Company. They granted to these railways vast, valuable, and perpetual franchises. With these rights, thus granted, no power can interfere. They are perpetual; they are indefeasible. But with these rights are carried all the deterring and prohibitory effects of the constitutional inhibition just quoted, by which the people seek to defeat the aggregations of monopoly, and prevent the corporations which they permit to exist from aggrandizement of power to the injury, or destruction of public and private rights. The court has no official concern in the policy of this law. It is too plain and significant for intelligent controversy. Whatever may be the rules upon similar topics, prescribed in other states, the people of Georgia, with full power to act, with undeniable jurisdiction over the important parties here, have embodied in their fundamental law this comprehensive and vital clause, clearly intended to accomplish what they deemed the salutary and healthful result of competing lines for railway transportation. Contracts in violation of this clause are not permitted. When attempted they are utterly void. They have no binding force. They are nullities, and are to be disregarded and ignored whenever it concerns a party at interest to do so. Now, what may not be done directly may not be done by indirection. The Central Railroad & Banking Company could not purchase the control of a railroad running parallel with its line from the same terminal points. Such a contract would be absolutely void, and, being void, and an absolute nullity, no title would pass under it. This being true, Gen. Alexander, and those who acted with him for the Central Railroad & Banking Company, cannot accomplish the same result in any other manner whatever. They cannot make a purchase to defeat the Short-Line, or to control it. It is scarcely just to the intelligence of a court of equity to expect it to fail to perceive the real facts and the true purposes of the contracting parties in the transfer from T. P. Branch to E. P. Alexander, and the subsequent transfer from E. P. Alexander to other persons, themselves directors in the Central Railroad & Banking Company of Georgia, and the Fort Valley & Savannah Company, which is its creature, controlled by its board of directors, and under the same president. The sworn averments of the bill and the answers, and failures to answer by the defendants, under the equity rules sufficiently show to the court what is perfectly evident: that this whole transaction was for the benefit and interest of the Central Railroad & Banking Company of Georgia; that the practical and operative franchises of the Savannah, Dublin & Western Short-Line Railway Company, and the shares of stock of the Construction Company, while nominally owned by individuals, and by another corporation, are really under the control of the president and board of directors of the Central Railroad & Banking Company of Georgia, a control as complete and absolute and effective as any power it may exercise.

The technical defenses urged for the defendants are not considered as meritorious. It is insisted there is no privity between the plaintiffs; that the defendants were improperly joined; that there is an adequate remedy at law; that there is no equity in the bill; that the allegations of fraud are not sufficient; that the court has no jurisdiction over Simmons,

and that he is a necessary party; and that the effect of the answers is to disprove the bill. But the plaintiffs proceed upon identical titles to correct an identical wrong by the same wrong-doers, and with reference to the same subject-matter. The bill is therefore not multifarious. The defendants are likewise concerned in one transaction, and that is the effort to control in the interest of the Central Railroad & Banking Company the franchises of the Short-Line Company. The remedy at law cannot be so complete and adequate as that in equity, and besides, frauds and trusts are peculiarly the subjects of equity jurisdiction. While Simmons is eminently a proper party, since he is beyond the jurisdiction of the court, he is not such an indispensable party as will defeat the power of the court to proceed against those within the jurisdiction. The answers are altogether too evasive and partial to have any effect towards disproving the material averments of the bill. It is not denied that the funds of the Central Railroad were paid to Branch; that by such payment the assets of the Construction Company, deposited with that company to secure the completion of the Savannah, Dublin & Western Short-Line, were transferred to the control of individuals who are themselves the president and a number of the directors of the Central Railroad. It is not denied that the Fort Valley road is a branch of the Central, and under its control. There is no attempt to dispute any of the main facts of the bill, and such a reply as that in the answer of Gen. Alexander, and of the Central Railroad & Banking Company, that if the plaintiffs have been wronged it is by their own laches, does not commend itself to the court. The same reply might be urged to the complaint of any one who had become loser as the victim of misplaced confidence. As to the want of notice of the plaintiffs' claims, this defense is no reply to supplement a void contract, and the substantial merit of these claims is sufficiently proven by the undisputed affidavits of the plaintiffs, which were submitted to the court.

The contracts by which these unlawful results were attained are null and void; and, since the Central Railroad & Banking Company and the Fort Valley & Savannah Company, which are practically one and the same corporation, have control of the assets upon which the plaintiffs have an equitable lien for their advancements made towards the performance of the trust originally assumed by John McKetchney and the Construction Company, the plaintiffs are entitled to an accounting against the defendants to ascertain and subject any values which are in their possession, and which may be applied to the discharge of the complainant's demands. It must be understood that the great underlying trust, in this whole transaction, was to build, construct, and equip the Savannah, Dublin & Short-Line Railway. It was for this that the state granted the charter. It was for this that McKetchney was empowered and given, not the title, but the control of the stock and securities of the Short-Line Railway Company. It was for this that the Construction Company undertook the trust. And this trust is not to be defeated by the wrongs of individuals, or the illegal contracts of corporations; and since, for its performance, the plaintiffs have in good faith paid their money, they are

entitled to recover from the trustees, who refuse to act, what would be their lawful compensation if the trustees had acted. As to T. P. Branch, —who, with James A. Simmons, most wrongfully, if the allegations of the bill are true, sold out and betrayed the rights of which they came into control,—he holds $100,000 in his proper person, to which he has no title whatever; and while the Central Railroad & Banking Company, and the parties who acted for it, may not be able to recover what they have wrongfully paid to him, he holds the sum he received as a trustee for the plaintiffs and other persons in interest who may be entitled to it, and who represent—in part, at least—the franchises and property of the Short-Line Company; and as the case now appears he should be compelled to make restitution of the sum which he has received for the benefit of the trust which he attempted to defeat, and for the legal beneficiaries of that trust. It would seem that the court has ample power to compel this; and the decision of the court is that the injunction prayed for against all the parties against whom it is prayed shall be granted, and that a receiver be appointed to take charge of the assets of the Savannah, Dublin & Short-Line Railway Company and of the United States Construction & Improvement Company, so far as they are within the control of either of the defendants, or otherwise in the jurisdiction of the court; and to recover, in such manner as may be deemed most effective, from T. P. Branch and the persons acting with him, the sum unlawfully paid to him by E. P. Alexander for the franchises, stocks, shares, and other property of the Savannah, Dublin & Western Railway Company, and that the case proceed regularly, as is usual in equity.